May it please the Court, I am Dwight Rabus of the DeWitt Law Firm for Appellant Julie Sprafka. With me today is Mr. Stephen Beatty, Trial Counsel for Ms. Sprafka, and Ms. Sprafka herself joins us in the Court. As I drove to Court this morning, I was reminded of the need to maintain a secure connection with an underlying service. In this case, we come before the Court because Ms. Sprafka suffered a loss of fixation between a product designed and manufactured by DuPuis, a knee replacement named Attune, which she received in 2016. I'd like to talk first about the evolution of the DuPuis Attune product family, then speak briefly as to the evidence which convinced Judge Frank to exclude our expert, Marty  We have read the briefs. We don't need a big-fact dissertation. Very good, Your Honor. Let me begin, then, with our position regarding Rule 702. There is a suggestion in the briefing of DuPuis that we do not respect the changes in the language of 702 enacted several years ago. That's far from the case. We suggest and explain in the briefs that the rule was modified because some courts, not this Court, but some Federal courts had taken the position that as to the four Daubert factors, that there was no filter exercise to be performed by the trial court for the element of reliability. We acknowledge that there is, but we believe that the precedent of this Court, particularly the Bear-Hugger case and cases decided since Bear-Hugger, establish that that particular threshold is low because an attack on reliability can be effectively mounted by the party opposing the expert at trial and cross-examination. So is your position that the new rule does not change Bear-Hugger precedent at all? It is, Your Honor. We believe Bear-Hugger correctly stated the law. The law itself was not changed by the amendment to the rule. The rule, as changed, emphasized the original intention of Rule 702 and how it should be applied by the courts. Unfortunately, prior to the change, there were Federal courts which entirely disregarded the reliability element as part of the trial court's gatekeeping faction. Notwithstanding whether or not the expert had any indicia of reliability, the court said that should be sorted out in trial. We acknowledge that there is a proper role for the trial court in assessing reliability. However, we think that is easily met, and on the facts of this case, was more than met by the report of Ms. Truman and her background. Judge Frank, of course, recognized that Ms. Truman, who holds 12 orthopedic patents, has been an expert in more than 54 cases, is an expert about orthopedic products. His decision, as you understand, goes to the fact that he believes that there were large-scale peer-reviewed studies which contradict her opinion, to the extent there is evidence which appears to contradict her opinion. And her opinion is based on, among other things, a review of that literature, a personal examination of the knee removed from Ms. Truman and other products in the marketplace, and importantly, her own extensive multi-decade background as an orthopedic product designer. That is properly placed before the trier of fact in  But you acknowledge the district court has a gatekeeping function, correct? Yes. And I think the standard review, it's a little confusing because the rule is one of inclusion, but it's an abuse of discretion. It's an abuse of discretion. So how is this, I mean, given the fact that you concede that the district court has that rule, and you're saying, look, this was, I guess the argument is this was just enough or it was enough, more than enough, to get to the jury. Help me walk through that. Sure. We think it was more than enough, Judge Kobus, and as this Court has explained previously, there is, and the term was an odd juxtaposition between the standard review, the abuse of discretion standard, and the fact that the rule, and the rule as consistently interpreted by the Federal courts, favors the admissibility of expert testimony. So it's an abuse of discretion standard applied to a statute, which calls on the trial court to be liberal in allowing expert testimony. We think Bear Hugger does an excellent job of mating together those considerations. Judge Frank, we think, applied an unduly strict standard. He does not survive the abuse of discretion test, in particular because he assumed, we believe, the role of fact finder in over-crediting certain materials introduced by Dupuy, which he thought... Well, that argument makes no sense at all. Abandoned, went beyond the gatekeeping because he had to weigh up the reliability and the persuasiveness of opinions. But dealing with fact matters. You can say that, but I find it completely unpersuasive. With all respect, Your Honor, we believe that when an expert like Ms. Truman relies on a variety of recognized factors, in this case, including her experience as a recognized orthopedic product designer, and is able to look at the products themselves and make an engineer's comparison as to how the products were designed and were they designed appropriately. But isn't the appropriate analysis include more than an engineer's assessment? I mean, as far as what bonds best, you know, what different aspects work when, you know, when installed sounds like the wrong word, but, you know, when used in a procedure? And doesn't that force the district court to do kind of the sort of weighing that Judge Loken has referred to? Certainly, we acknowledge that the Daubert test, as applied by this Court, sees that the admissibility of an expert is a multi-factor test. There are four Daubert elements. Reliability is one of the four. But we do not think the preponderance standard under Rule 702 is the preponderance standard which a jury uses to decide whether one side has carried its burden and is more persuasive than the other. That was always a debate under the old rule. And the attempt was to clarify that preponderating evidence is what you consider. And that does require some sort of weighing. I'd like to step back and just go through just an analysis and play this out in my mind, if you'll bear with me for a moment. You start first with the idea, Donovan Frank says, Judge Frank says, that qualified as an expert, not a problem, right? And so we don't really have to talk very much about her many years of experience and all that because that opens the door so that she's a qualified expert. Then we go through to saying, well, now all of a sudden we've got to look at, well, what renders the opinion to be admissible? And what renders the opinion admissible are the four Daubert factors as you weigh them and analyze them. And the issue that, as I see it here, is we start off with, you've got training. Training matters because we're going to offer an opinion about medical device engineering. I am a medical device engineer. I have many years experience in the field and I've worked with joint replacement devices. Okay. And so her opinion has to have some weight based on that under the Daubert analysis, right? Then you go to the second one as you look at, I've reviewed the literature. Now, the literature does not seem to actually support her opinion by any sort of preponderance of the evidence standard. And that seems to me to be a problem, right? I mean, if you could look at a body of literature, if there was a division in the literature that on both sides you had, you know, opinions that you could accept of equal weight and merit in the literature, you'd be able to say, I've reviewed the literature and I think all these people are wrong and these people are right. But here what you've got is a couple of articles that have been, you know, attacked for the basis of lack of numerosity being mostly anecdotal in nature and being an opinion that doesn't have a failure rate in ratios established. So it lacks numerical precision, right? And then you've got anecdote. And so that's kind of what she's done. Now, Donovan Franks, Judge Franks says that's not enough, right? Why is he wrong? Because, I mean, you know, in a perfect world, there'd be a dispute amongst the literature. There'd be some ability of the expert to point to, well, here's the real thing. This is what it looks like in comparison to other devices. But instead, she says, failure rates appear to be similar. Judge Frank is wrong because I believe he misunderstood what those large database reports tell you. The National Registries, the MAUD reports count complaints about totally replacement products and have a category for aseptic loosening. And as we explained in the brief, there are different kinds of aseptic loosening, only one of which is the issue before the court. The separation of the tibial base plate from the cement, the failure to hold the cement. Artificial knees fail in other ways. So we think Judge Frank took those studies to be evidence that Ms. Truman's point of fact, those large-scale studies are not probative of the position of either party. Further, we think Judge Frank neglects the fact that Ms. Truman's opinion matches up almost perfectly with what we see in the design history file produced by Dupuis and Discovery. You have the Sigma product, which was highly successful, which had undercut pockets. When they designed a tune, the record reflects, and this is the testimony of the 30B6 witnesses as well as the notes in the design history file, there was an affirmative choice made by the product designer to weaken the bond between the tibial base plate and the cement. But she doesn't then compare or analyze the positive reason for that. She just says that's negative. Yeah, she does say that's negative as it does. That's not sufficient. That's not what a jury should do. Well, I believe, I believe, Your Honor, it would be within the jury's purview if it's convinced that the product was designed to loosen the bond such that there was a greater incidence of separation. So that the inevitable number of revisions, surgeries that are required are easier, cheaper, and safer. And that balance is not defective design. But we would argue to the jury. In my view, I don't see how the district court abuses discretion to apply that thinking. I would suggest, Your Honor, because at trial, the jury would be told that this product was designed, the tune product was designed to have a weaker bond, which radically increases the incidence of revision surgeries. And it is unreasonable to conclude that anybody would. That about dramatically increasing. We believe the jury could find that was a. You may have a numerator data. You don't have denominator data. Neither does Dupuy, we suggest, Your Honor. Well, that's okay. So now that's the way that the case goes forward. Why? Why do we need her opinion, which is not based on valid data? Why can't the jury just do what we're debating here? Well, Your Honor, we. Why do we need her? Well, Your Honor, we're required under, under Minnesota law to have her an expert. And in this case, her opinion would basically second. Even, I mean, you know, you could be arguing that in my view. Yes, Your Honor. Just that this may be a case where you don't need an expert, at least not the kind that, that Daubert contemplates. I fully agree, Your Honor. This case can be won by the plaintiff without the support of an expert witness. However, under Minnesota law, applicable to the case, we have to come forward with an expert. And so we lost some re-judgment because the expert was excluded. Does, does Minnesota recognize in products liability claims a race-hypso theory? I don't believe it does. Okay. And that, and that, and because some states do. And so did they, did, were the defendants in control of the cement as well? Or was that a, an adhesive that was sold to other manufacturers of other devices as well? Do you know? The, the cement comes from other providers. And, and as you raise that, Judge Erickson, let me emphasize, this cement is not an adhesive. It is essentially a grout. And so it needs to flow into something to get, to get a hold. That's why the undercut pockets, which were featured on the Sigma, removed in the Attune, and restored in the S plus, are critical to the ability of the tibia to hold, hold to the product. I, I would reserve my remaining time for rebuttal. Ms. Pauley. Good morning. And may it please the court. My name is Erin Pauley and I represent the Appley Medical Device Business Services, Inc., formerly known as DePue Orthopedics. I'll refer to it as DePue today. We would respectfully request that this court affirm the district court's order and opinion, excluding each of the three opinions proffered by plaintiff on behalf of Ms. Truman, and then subsequently granting summary judgment as a result of the same. First, it was not an abuse of discretion for the district court to find that plaintiff had not demonstrated by a preponderance of the evidence that each of Ms. Truman's three opinions met the admissibility requirements that are set forth in Rule 702. And second, the district court did not err in subsequently granting summary judgment as without Ms. Truman's testimony as to design defect, there was no genuine issue of material facts that remained for a jury to decide. I know you folks all want to talk about Ms. Truman all day, but I'm more concerned with the second issue. So leave a little space for that. Yes, Your Honor. As to the first issue briefly, the district court's adherence to Rule 702 as amended in finding that plaintiff had not demonstrated by a preponderance of the evidence that each of Ms. Truman's opinions were admissible was not an abuse of  The district court noted that Rule 702 was amended to clarify and emphasize that an expert testimony may not be admitted unless that proponent demonstrates that it's more likely than not that each of the reliability factors that are set forth in Rule 702 have been met. The reliability is the threshold for admissibility. It's only once the court has found that each of those opinions are reliable and admissible under Rule 702 that then an opponent could attack the credibility of that opinion with a jury, and that would go to the weight of the evidence. But reliability has to be met and proven first. Why is Dr. Brand's testimony not sufficient? Because there was no motion to strike his testimony or his opinions, and he was identified. Usually the treating physician problem is they never identify the treating physician. But in this case, the treating physician was identified. The opinions were set forth, and there was no motion to strike. There was no deliberate motion brought as related to Brian's testimony. So Brian's testimony stands as in the record. Why is that insufficient as evidence to go forward, at least at this stage? I mean, you may move to strike his opinion at the time of trial on the basis that it suffers from the same defects, but that wasn't done so far. So, I mean, it seems to me that there's a really open question about why isn't that enough? I mean, because I look at it and I'd say, you know, that opinion, as it stands, still sits as something that may be admissible. And it looks like he offers like six different points. All six points seem to be sufficient to create a question for the jury if they are, in fact, admitted in the testimony. Yes, Your Honor. So if you did not move to exclude or file a Rule 702 motion with respect to Dr. Brian's testimony, I would first note that Dr. Brian was the revising surgeon that performed Ms. Spravka's knee revision. He was disclosed as a non-retained treating expert witness. In his disclosure, there was no opinion proffered that he would be providing testimony or opinions as to why the DePuy was defectively designed. Why?  I don't understand why that's enough that you can't even talk about him. Yes, Your Honor. So because Ms. Truman and Dr.  didn't move to strike, he gave opinions. We can look at those opinions and see if they are within the scope of what Minnesota requires in this kind of case. Yes, Your Honor. And it just I mean, that's what, what else is there? So the opinion that was proffered by Dr. Brian, there were two specific opinions. One, that Ms. Truman's knee was revised because there was de-bonding in that specific case. But what's critical here is that Dr. Brian also admitted in his deposition that de-bonding is not unique to the attune. But this is a question of rates. And you guys can't even agree on whether it's comparative rates between devices or the rate of failure for this device. And I'm sorry. You know, and I think You have presented such a confusing issue on appeal, frankly, that it's just a struggle. You see, what I'm thinking is it's actually six things that he says. He says, first, that there's a failure of the cement to bond, such an aseptic mechanical loosening of the attune system happened. Two, that the de-bonding issue is the sole cause of Mrs. Sprafka's need for revision surgery. Three, that given the failure of the system, and but for that, Mrs. Sprafka would not have required the knee revision surgery. Four, that his observations during the surgery are consistent with the reported findings of other physicians with whom he works who are primarily revision-based kind of surgeons, and they say that this is a more common failure among attune devices. And five, that it should not have de-bonded in the absence of a mechanical failure of the device or the cement. And finally, he says that the attune device is defective. Now, that seems to hit every single point that one would ordinarily look for from an expert opinion that would be sufficient to create a jury question. My question is, why isn't it? Two points, Your Honor. First, because he admits also that de-bonding is not unique to the attune, and that because a device becomes loose and requires a revision, that does not in itself mean that it's defective. He admits that in his deposition, as does Ms. Truman. Because of that... So, we're back to rates, right? Right. Right. So, the district court didn't abuse its discretion... Which rate, and you'll argue about, well, there's probably no comparative rate data. So, no expert could deal with that. I mean, there can't be that big a universe of this kind of surgery. And I know they're not uncommon, but you talk about the kind of statistical data that experts typically expect to have on their fingertips. That's not going to be there, right? So, there was data available... Am I right about that? You know the record. I don't. No, Your Honor, there was data available that established a rate. That both Ms. Truman and Dr. Brien...  The rate of revision for all knee devices, including the Attune, specifically. Where did it come from? The registry data. There's a UK registry. There's a Wales registry. Okay. What's the denominator? What's the total? It sets a specific time period. So, for 10 years, per se, it'll track every Attune implanted, and then it'll also track how many of these Attunes need to be revised. Now, do we have data about the rate between the Sigma device and the Attune device? Yes, Your Honor. And what's the comparison there? Where do I find that? So, it was relied on by... Where do I find it in the record, please? It is in Ms. Truman's report. It's referenced as an exhibit to her report. It was also specifically referenced on page 10 of the opinion, which is page 10 of the addendum. Do the registries highlight what the failure was with each of these devices, or simply that there was a failure? I mean, my recollection was your colleagues on the other side suggest, no, it's not that specific. So, it's not helpful data in the registries. Yes. So, the registry data will note the reason for the revision with the reason being mechanical loosening. Debonding is one component of mechanical loosening. So, it doesn't go to debonding. It talks at a higher level of... Okay. Precisely. So, by the appellant's theory here, if the registry data shows that the rate of revision due to mechanical loosening is a high percent, then that should actually show that the debonding was occurring and resulting in... Given that Rule 702 is a rule of inclusion, why isn't the proper testimony that, in my clinic, we do a lot of these and this fails more often? Why isn't that sufficient? I mean, there are times where the district court seem to think, well, we need peer-reviewed studies or other things. Why isn't that enough to get to the jury? So, the district court did consider that testimony and it noted that it was anecdotal evidence that didn't rise to the level... Is that really anecdotal? I mean, it's not a peer-reviewed study, but you have direct evidence of a doctor saying, this fails more often in my clinic. Is that anecdotal? Yes, Your Honor, and that we had no additional facts. So, we don't know how many of the attunes had been implanted in that clinic, where those attunes that ended up needing to be revised came from, how they were cemented, what the technical technique used by each of the surgeons. Because the bonding's not unique to the attune, there's other information that Ms. Truman noted needed to be known to establish a study or even for her studies that she relied on, the Venuti study, the Murphy study, and Dr. Brand's testimony. You had to have more information since the bonding's not unique to the attune. This is exactly kind of the problem that Daubert's interjected into this whole discussion. And it's this notion that we qualify some experts by experience. And part of their experience, by nature, requires them to say, you know, let's go into a different area. Let's say you were talking about cars and you're sitting there going, you know what? The fuel pump in Fords fail more frequently than in GM products because the Fords and the gas tank, and people run their gas tanks without them being at least a quarter full, which leaves the pump exposed. And I'm just a mechanic, and I can tell you, but, you know, having driven a lot of Fords in my lifetime, I've had a lot of guys tell me, he says, never drive your Ford with less than a quarter tank gas, right? Now, I don't know that there's any peer-reviewed studies out there, but I do know that there's like an army of mechanics because over the last 20 years, I've had a bunch of them tell me the same thing, that, you know, why is that not reliable? Because what you've got here is Dr. Brain saying, in my experience, I see more failures with the Attune device and, then there's the anecdotal piece, in my conversations with other people who do primarily revision surgeries, they report the same thing. So why is it not admissible? Why is, I mean, what's the problem with that? Because the opinion that's being proffered here is that the Attune should fail at a higher rate than the Sigma, which was a predecessor, or the Attune S+, which was its successor, because that's the ultimate opinion, since it's not unique, the bonding's not unique to the Attune, you have to have some reliable evidence to be able to become admissible, to walk through each of the four factors under Rule 702. Here's, there's not sufficient facts or evidence, there's no reliable methodology. Putting the general standard, I mean, you can do that about anything. So Ms. Truman's opinion is a hypothesis, that the Attune should debond more. Yeah, and I want to set aside Ms. Truman, I think that's a totally different story, because she's an engineer who engages in design, she's the kind of person that you ordinarily would see many peer-reviewed articles, they don't exist, and, you know, and so, I mean, that set of problems fits nicely into the four-pronged Delbert analysis, right? But Dr. Breen's testimony doesn't fit quite so neatly, and we have a whole line of cases all around the country that say, well, what do you do with these experts who we acknowledge have expertise, but they're also not scientists in the sense that they're doing research and design, and that they rely on literature and studies in the same way, you know? And, you know, courts have struggled with that, because, you know, you look around, you'll find some district courts are saying, well, this expert doesn't really fit very well in that kind of Delbert analysis, but within the rule, they are still admissible given the liberality of the rule on admissibility. And I think that's really the story here with Dr. Breen, and there is no analysis on whether it ought to be admitted or not. So, I mean, you know, we don't know for sure that, well, we do know because the summary judgment was most granted, but, I mean, in the end, you know, the findings about Breen are, you know, not really adequate to say that there, that he runs afoul of the analysis point by point, because nobody bothered to raise that as a motion before Judge Franks. Your Honor, just to respond to the nobody bothered to raise that point, this issue, we argued, we filed the rule 702 motion to exclude Mary Truman. We then filed a motion for summary judgment. In opposition to that motion for summary judgment, plaintiff appellant never said that Dr. Breen's testimony or opinions alone would create a genuine issue of material fact of dispute. In fact, that's- In a plaintiff's world, you know, one is always surprised when they strike your expert, right? And at some level, you know, there's, you know, you're asking them to anticipate a problem with Truman that they didn't think they had, and then, you know, anticipate this as, oh, well, whatever, we're still good enough with just the treating revision surgeon, right? I mean, in the real world, I mean, I've tried a lot of cases. I don't believe I ever saw anybody ever say that. Dr. Breen did offer a specific causation opinion in this case. But he did not offer any opinion about what certain design features of the attune caused her attune to debant. Which would be outside of his area of expertise, right? And if you have a negligent design claim, you need an expert that says, what's wrong with the design itself? You can't just say, you know, like, you know, fuel pumps fail more frequently. Yes, sir. In a, you know, that's not good enough. You have to say why it fails. And with a medical device case specifically, it's undisputed here that Minnesota law requires you to have an expert opinion in support of a design defect case. Didn't he specifically say in a deposition, I simply don't know the answer to that? Yes, he was asked, do you know what the rate of revision in your practice, can you provide the rate of debonding? And he said he could not provide. But him and his partners felt it was more than it should be. And that, him and his partners feeling it should be more than it should be, that is the exact type of anecdotal evidence that the district court did not abuse its discretion when it considered that testimony, because Truman had relied on it in its 702 opinion. Is it clear that he was considered at all, since the lawyers didn't present the issue properly, to either one of you? Yes, Your Honor. Dr. Bryan, how do we know what analysis of this kind has already been done by the district court, as opposed to what would need to be done in order to proceed on the theory that he satisfies whatever Minnesota law requires as the expert? And I see my time has expired. May I briefly answer this question? So just on page 9 of the addendum of the opinion, the district court specifically considered this testimony as to Dr. Bryan's, that he had acknowledged that he did not actually know the rate of debonding. Rather, he and his partners felt that it was higher than it should be. That's page 9 of the court's opinion. Thank you, Your Honor. We've got a half minute for rebuttal. Yes, Your Honor, two things. First, I would emphasize, Truman's opinion is corroborated strongly by the design history file, and I encourage the court's attention to that, where the surgeon advisors for Dupuy predict the consequences of getting rid of roughness on the device and not having undercuts. So it was predicted, it came true, and Truman's testimony, and Judge Loken recognizes this, is really a confirmation of something that exists factually. Second point, I encourage the court to look at two cases, not in our brief, first, Academy Bank. You'll put them in a Rule 28J letter? We can do that, Your Honor. Please do. I do have just one question. Is there anything about Dr., is it Bryan or Brein? Brein. Yeah. If we look at Dr. Brein, is there anything in Judge Frank's opinion, other than the last sentence on page 8 and the first sentence on page 9, about Dr. Brein, that just simply says that he testified he and his partners observed an unacceptably high rate of attuned revisions, and he acknowledged that he did not know the rate, but that it was unacceptably high. That's all Judge Frank says. Judge Brein's testimony in his deposition does attach numbers to the phenomenon, though. He talks about... And I get that, but I'm just saying, as far as the analysis is concerned, all we have are those two conclusory statements. And there's no weighing of it. There's no indication that Judge Frank's actually considered that to any great degree. That's correct, Your Honor. Thank you. Thank you, counsel.